**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RITA CAIN, | ) | |
| | ) | |
| Plaintiff, | ) | No. 10 C 6849 |
| | ) | |
| v. | ) | Magistrate Judge Michael T. Mason |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Rita Cain ("Cain" or "claimant") has brought a motion for summary judgment [19] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") under the Social Security Act ("Act"), 42 U.S.C. §§ 416(i) and 423(d). The Commissioner has filed a response [24] asking the court to uphold the decision of the Administrative Law Judge ("ALJ"). We have jurisdiction to hear this matter pursuant to 42 U.S.C. §405(g). For the reasons set forth below, claimant's motion for summary judgment [19] is granted.

**I.  BACKGROUND**

**A.  Procedural History**

Cain filed her application for DIB on June 5, 2008, alleging an onset date of July 27, 2006 due to chronic obstructive pulmonary disease ("COPD"), obesity, osteoarthritic left knee, and high blood pressure. (R. 170.) Cain's application was denied initially on

1

August 28, 2008, and again on November 20, 2008 after a timely request for reconsideration. (R. 49-50.) Cain then requested a hearing, which was held on December 8, 2009 before ALJ Curt Marceille. (R. 32-48.)

On December 18, 2009, ALJ Marceille issued a written decision denying Cain's request for benefits. (R. 9-20.) On February 2, 2010, Cain filed a request for review of the ALJ's decision. (R. 4.) The Appeals Council denied that request on August 25, 2010, at which time the ALJ's decision became the final decision of the Commissioner. (R. 1–3); *Zurawski v. Halter*, 245 F. 3d 881, 883 (7th Cir. 2001). This action followed.

### B. Medical Evidence

Cain was admitted to Community Hospital in Munster, Indiana on July 27, 2006. (R. 232.) Admission records reveal that Cain complained of shortness of breath and felt that her throat was closing. (*Id.*) In his physical examination notes, Dr. Waddah Ahdab, M.D. ("Dr. Ahdab") noted that Cain was "a very heavy smoker, smoking 4-5 packs per day." (R. 236.) Cain received an Echocardiogram test ("EKG"), which revealed mild concentric left ventricular hypertrophy and trace mitral regurgitation. (R. 227.) A chest CT showed "interstitial and micronodular infiltrate of the middle lobe" which may "represent an infectious infiltrate." (R. 254.)

Cain's condition improved with treatment and, after spending two days at Community Hospital, she was released on July 29, 2006 in stable condition. (R. 231.) Upon discharge, Dr. Ahdab diagnosed pneumonia, COPD, congestive heart failure, mild diabetes, hypertension, obesity, and hyperlipidemia. (*Id.*) Dr. Ahdab instructed Cain to follow up in 3-5 days, and noted that she was to resume activity "as tolerated." (*Id.*) On August 22, 2006, Cain returned to Community Hospital for a follow up chest CT scan.

(R. 262.) Radiologist Dr. Wassim Atassi found "interval resolution of hazy air space disease within the right middle lobe," but noted that "currently the lungs are clear." (*Id.*)

Records reveal that Cain returned to see Dr. Ahdab several times throughout 2008 and 2009. Specifically, Dr. Ahdab saw Cain on May 28, 2008, August 27, 2008, November 24, 2008, February 24, 2009, June 1, 2009, and September 1, 2009. (R. 267-268, 299-304, 310-319.) In his treatment notes, Dr. Ahdab noted that Cain's lungs were clear bilaterally and that she was "doing well" and "o.k." throughout 2008 and 2009. (R. 310-319.) At the August 27, 2008, appointment, Cain and Dr. Ahdab both signed an application for a disability license plate on the grounds of permanently restricted mobility "due to a pulmonary or cardiovascular disability, arthritic condition, orthopedic condition or neurological impairment." (R. 301-302.) Cain eventually received those plates. (R. 222.)

On July 19, 2008, Dr. ChukwuEmeka Ezike, M.D. ("Dr. Ezike") performed an internal medicine consultative examination for the Bureau of Disability Determination Services. (R. 273-277.) Cain complained of shortness of breath, dyspnea with mild exertion, and pain in the left knee with prolonged walking. (R. 273.) Specifically, Cain reported that she could walk only half a block because of shortness of breath, but had no difficulty standing or sitting, and could lift fifteen pounds. (R. 274.) As for activities of daily living, Cain told Dr. Ezike that she can vacuum her home a little bit at a time and needs assistance with shopping. (*Id.*)

Dr. Ezike's physical examination revealed that claimant was 5'2.5", weighed 251 pounds, and was markedly obese, but not in acute distress. (R. 274.) Dr. Ezike observed that Cain had normal range of motion in her knees with crepitation in the left knee, but found no knee tenderness. (R. 275.) Dr. Ezike further observed that Cain was unable to squat completely without support. (*Id.*) According to Dr. Ezike, Cain was able to get on and off the exam table with no difficulty, could walk greater than 50 feet without support, had a non-antalgic gait without the use of assistive devices and was able to perform toe/heel walk. (*Id.*) Dr. Ezike also noted that Cain had normal range of motion in her shoulders, elbows, wrists, hips, ankles, cervical and lumbar spine, and had no lumbar or paralumbar tenderness. (*Id.*) Grip strength and her ability to grasp and manipulate objects were normal. (*Id.*)

With respect to Cain's lungs, Dr. Ezike noted that there was "good air entry bilaterally with mild diffuse wheezes," but "no rales or crackles." (R. 274.) Cain also received a pulmonary function test, which revealed a moderate restriction in breathing with no significant improvement after medication. (R. 281.) Following his examination, Dr. Ezike assessed COPD, obesity, left knee degenerative joint disease, hypertension and diabetes. (R. 275–276.)

On August 26, 2008, state agency reviewing physician Dr. Richard Bilinsky ("Dr. Bilinsky") assessed Cain's Physical Residual Functional Capacity ("RFC"). (R. 288-294.) Dr. Bilinsky determined that Cain could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, and could sit, stand, or walk for six hours each in an eight hour workday. (*Id.*) Dr. Bilinsky also found that, as a result of Cain's left knee degenerative joint disease, her postural limitations included never climbing ladders,

ropes or scaffolds and only occasionally climbing ramps or stairs, balancing, stooping, kneeling, crouching, and crawling. (R. 290.) Dr. Bilinsky further determined that Cain had several environmental limitations due to her COPD diagnosis, which included avoiding concentrated exposure to extreme cold, extreme heat, fumes, odors, dusts, gases, and poor ventilation. (R. 292.) Cain had no manipulative, visual or communicative limitations. (R. 291-292.) In closing, Dr. Bilinksy noted that Cain's statements were credible and consistent with the objective medical findings and the limitations indicated in the RFC assessment. (R. 295.) On November 17, 2008, Dr. Virgilio Pilapil affirmed Dr. Bilinsky's initial RFC determination, and noted that Cain was "partially credible." (R. 305–307.)

### C. Daily Living Questionnaires

In her written responses to the Social Security Administration's questions regarding "activities of daily living," Cain stated that she lives with her husband. (R. 186.) She explained that she spends her days preparing meals, reading, watching television, doing crossword puzzles, doing laundry, feeding her dog, watering flowers and taking her medications including testing her blood sugar three times a day. (R. 186-192.) According to Cain, her illnesses affect her ability to lift, squat, bend, stand, walk, kneel, and climb stairs. (R. 191.) She also said that she can walk only twenty feet before needing to rest. (*Id.*)

Cain stated that she took eight medications regularly, including Albuturol and Pro Air for COPD, Glimepirde, Byetta, Lantus and Metformin for treatment of diabetes, Lisinopril for treatment of high blood pressure, Simvastatin for treatment of high cholesterol, and Aleve for osteoarthritis. (R. 222.)

### D. Claimant's Testimony

Cain was born on November 14, 1946, making her 63 at the time of the hearing. (R. 36.) Cain graduated high school and is able to read and write. (*Id.*) Cain testified that she last worked at the American Legion Post as a bar manager and bartender, where she worked for approximately 30 years. (R. 37, 216.) She managed the bar in the mornings and tended bar in the afternoon. (*Id.*) On a typical workday, Cain testified that she had to walk or stand for six hours, sit for two and a half hours, stoop for one hour, and handle and grasp large objects for fifteen minutes. (*Id.*) Cain also stated that she had to lift twenty pounds occasionally and ten pounds on a frequent basis. (R. 37-38.) Specifically, Cain explained that she had to lift and carry cases of liquor to the next room and "stock it." (R. 42.) Cain has not worked since the day in 2006 when she stopped breathing and was taken to the hospital. (R. 36-37.) Cain also stopped smoking on that day. (R. 39.)

When asked why she felt she can no longer work as a bartender, Cain testified that she cannot walk long distances, including the length of the bar, which is about fifty feet. (R. 38.) She also testified that she loses her breath very easily, gives herself injections three times a day, and uses a pro-air inhaler four times a day. (R. 38-39.)

On a typical day, Cain does light housekeeping and shopping. (R. 39.) Cain explained that while she is able to shop for groceries, cook, and wash dishes, she has to take breaks throughout each individual task. (R. 42.) Cain also stated that when she shops at Walmart or Kmart, she stops frequently and uses a shopping cart to support herself when walking around the store. (R. 40.) Her handicap parking plates allow her to park closer when she shops. (R. 39-40.) Cain attends church services and visits

family on a weekly basis. (R. 44.) She visits her friends at the American Legion every couple of months now that it is a smoke-free establishment. (*Id.*)

### E. Vocational Expert's Testimony

Vocational Expert Grace Gianforte ("VE" or "VE Gianforte") also appeared and testified at the December 8, 2009 hearing. (R. 43-46.) VE Gianforte described Cain's past work experience as a bartender as light and semi-skilled. (R. 44.)

The ALJ asked the VE to consider a hypothetical individual of the claimant's age, education, and past relevant work experience, who is able to perform light work as the Agency defines that term, with the additional limitations of only occasional ramps or stairs, never climbing ladders, ropes or scaffolds, occasionally balancing, stooping, kneeling and crouching, and the need to avoid concentrated exposure to extreme heat, extreme cold, and pulmonary irritants, such as fumes, odors, dust, gases, and poor ventilation. (R. 44.) According to VE Gianforte, such an individual could perform Cain's past bartending work as typically performed and as she performed it "with the exception of the need to avoid respiratory irritants." (*Id.*) But VE Gianforte explained that the individual would be able to perform the job in "a nonsmoking environment" such as the American Legion. (R. 45.)

Cain's attorney then asked the VE whether being unable to stand or walk for more than two hours out of an eight-hour work day would preclude Cain from performing her past relevant work. (R. 45.) The VE responded that Cain could not perform her past relevant work because it required walking and standing generally up to six hours a day or more. (*Id.*) Cain's attorney also asked whether the use of a stool would be a reasonable accommodation for a bartender. (R. 46.) VE Gianforte

7

responded that a person working in an establishment that was "not busy" could potentially use a stool, but noted that the use of the stool would not be at will. (*Id.*) The VE explained that because a bartender's obligation is to serve customers by mixing and pouring drinks, checking out, making change and ringing up sales, use of a stool would not be an accommodation that would allow a person to fully perform the functions of the job. (*Id.*)

## II. LEGAL ANALYSIS

### A. Standard of Review

We must affirm the ALJ's decision if it is supported by substantial evidence and is free from legal error. 42 U.S.C. §405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). We must consider the entire administrative record, but we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford v. Apfel*, 227 F. 3d 863, 869 (7th Cir. 2000)). We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Id*. While the ALJ "must build an accurate and logical bridge from the evidence to [his] conclusion, [he] need not discuss every piece of evidence in the record." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The ALJ must "sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence… [and to

enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F. 2d 284, 287 (7th Cir. 1985)).

### B. Analysis under the Social Security Act

To qualify for disability insurance benefits, the claimant must establish that she is "disabled" under the Act. A person is disabled under the Act if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling ('a listing level impairment' or 'listing'), (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work and (5) whether the clamant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176; 20 C.F.R. § 404.1520. The claimant has the burden of establishing a disability at steps one through four. *Zurawski*, 245 F.3d at 85-86. If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

Here, ALJ Marceille followed the five-step analysis. At step one, the ALJ found that Cain had not engaged in substantial gainful activity since July 27, 2006, the alleged

onset date of disability. (R. 14.) At step two, the ALJ found that Cain had two severe impairments: COPD and obesity. (*Id.*) At step three, the ALJ found that Cain did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments that the Commissioner considered conclusively disabling. (R. 14-15.) Next, the ALJ concluded that Cain had the RFC to perform light work as defined in 20 CFR 404.1567(b), except that "claimant must avoid concentrated exposure to extreme heat, cold, and pulmonary irritants; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch; and can never climb ladders, ropes or scaffolds." (R. 16-17.) At step four, the ALJ determined that Cain was capable of performing her past relevant work as a bartender. (R. 19.) As such, the ALJ found that Cain was not under a disability as defined by the Act. (R. 20.)

Cain now argues that the ALJ's decision should be overturned because he (1) improperly evaluated her obesity; (2) erred in evaluating her credibility; (3) improperly concluded that she could perform her past relevant work; and (4) failed to include all of her limitations in his hypothetical questions to the VE.

### C. The ALJ Did Not Err at Step Three When He Determined that Cain Did Not Meet or Medically Equal any Listed Impairment

Cain first argues that the ALJ failed to properly assess her obesity at step three. At that step, the ALJ must determine whether a claimant's impairment, or combination of impairments, including obesity, meets or medically equals the criteria of an impairment listed in 20 C.F.R. part 404, Subp. P, App. 1. Although obesity is no longer a separately listed impairment, the ALJ must recognize that "obesity may increase the severity of coexisting or related impairments to the extent that the combination of

impairments meets the requirements of a listing." Social Security Ruling ("SSR") 02-1p, 2000 WL 628049, at *5 (2002). Further, the ALJ may find that obesity, by itself, is medically equivalent to a listed impairment "if the obesity is of such a level that it results in inability to ambulate effectively." *Id.*

Citing to her treatment for degenerative joint disease and her testimony that she can no longer walk more than twenty feet and takes breaks while she performs household chores, Cain now argues that the ALJ failed to specifically consider Listing 1.02. That listing, titled "Major dysfunction of a joint(s) (due to any cause)," applies to musculoskeletal impairments

> [c]haracterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).

20 C.F.R. Pt. 404, Subpt. P, App.1 § 1.02. To fully meet the criteria for Listing 1.02, the impairment(s) must involve at least

> one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; or ... one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively.

*Id.* at § 1.02A. "Inability to ambulate effectively" is defined as "extreme limitation on the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *Id.* at § 1.00B2b.

It is clear that ALJ Marceille did not explicitly address Listing 1.02, and Cain is correct that an ALJ's failure to mention specific listings, when paired with a perfunctory analysis, requires remand. *See Ribaudo v. Barnhart*, 458 F. 3d 580, 583 (7th Cir.

11

2006). But, more importantly, the claimant bears the burden of proving his impairment meets a listing, and an ALJ's failure to reference a relevant listing does not alone require reversal. *Knox v. Astrue*, 572 F. Supp. 2d 926, 935 (N.D. Ill. 2008).

Here, Cain cites to little in the way of objective medical evidence that would support a finding that she meets Listing 1.02 or any other listing for that matter. We note that Cain's reliance on *Accurso v. Astrue*, No. 10 C 0968, 2011 WL 578849 (N.D. Ill. Feb. 9, 2011), is misplaced. There the Court ordered remand because, among other errors, the ALJ failed to address the plethora of medical evidence that would support a finding that the claimant met Listing 1.02. *Id*. at *4. In this case, where there is a dearth of medical evidence to support a finding that the claimant meets the listing, we conclude that the ALJ did not err at step three.

### D. The ALJ Erred in Evaluating Claimant's Credibility

Cain next argues that the ALJ erred in evaluating her credibility. To succeed on this ground, Cain must overcome the highly deferential standard we afford credibility determinations. It is well settled that the ALJ is in the "best position to see and hear the witnesses and assess their forthrightness." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). As such, a reviewing court affords the ALJ's credibility finding special deference. *Id*. Indeed, the court may only disturb a credibility finding if it is "patently wrong," that is, unreasonable or unsupported. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). Despite this deferential standard of review, Seventh Circuit precedent confirms that the ALJ must explain his decision in such a way that allows the reviewing court to determine whether he reached the decision in a rational manner, logically based on his specific findings and the evidence in the record. *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th

12

Cir. 2011) (*citing Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004) (noting that the "court will affirm a credibility determination as long as the ALJ gives specific reasons that are supported by the record for his finding.")).

In the instant case, the ALJ found that Cain's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but "her statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 17.) Such a statement is "precisely the kind of conclusory determination that SSR 96-7P prohibits." *Brindisi*, 315 F.3d at 787. By first determining the RFC and then rejecting statements and evidence that do not support such a determination, an ALJ "turns the credibility process on its head." *Id.* Of course, we recognize here that the ALJ provided a little more explanation than did the ALJ in *Brindisi.* Unfortunately, that explanation is otherwise flawed.

As far as we can tell, the ALJ based his credibility determination primarily on his finding that Cain's statements were not consistent with the objective medical evidence. While the ALJ can and should consider the objective medical evidence, SSR 96-7p dictates that the ALJ must also consider (1) the claimant's daily activities; (2) the duration, frequency, and intensity of pain; (3) the precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) any other functional restrictions. SSR 96-7P, 1996 WL 374186, at *3 (1996.) Here, while ALJ Marceille did briefly address some of those factors, he failed to build a logical bridge between the evidence and his conclusions.

13

First, in discrediting Cain's complaints of shortness of breath, ALJ Marceille took issue with Cain's lack of treatment following her July 2006 visit to Community Hospital. (*See* R. 17 - "The record documents that the claimant has had no further treatment.") But, as explained above, Cain did in fact return to see Dr. Ahdab on a number of occasions in 2008 and 2009, and continued to take her various medications, which certainly amount to treatment. Strangely, later in his opinion, ALJ Marceille recognizes that Cain returned to see Dr. Ahdab, but states that her visits were "sporadic" and takes issue with the fact that she has not required any treatment other than medication. (R. 18.) This inconsistency in the ALJ's reasoning does not inspire confidence that he undertook a careful review of the record. Further, to the extent that ALJ Marceille relied on Cain's "sporadic" treatment history to discredit her statements, he failed to inquire into the reasons for her lack of frequent treatment as required by SSR 96-7p and Seventh Circuit precedent. *See Craft v. Astrue,* 539 F.3d 668, 679 (7th Cir. 2008) (noting that the ALJ "must not draw any inferences" about a claimant's condition from this failure unless [he] has explored the claimant's explanations as to the lack of medical care.").

As for Cain's daily activities, ALJ Marceille placed emphasis on her trips to Walmart and Kmart, her visits with her sister and mother, and the work she does around the house. (R. 17.) And, although the ALJ included Cain's testimony that she has to stop frequently while doing housework and support herself with a cart while shopping, he went on to find that Cain's "extensive daily activities" support his RFC assessment without fully explaining if or why he discredited the testimony regarding *how* she performs those activities. (R. 19.) The Seventh Circuit has repeatedly cautioned

14

"against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." *Craft*, 539 F.3d at 680 (quoting *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006). On remand, as the *Craft* court explained, unless the ALJ finds Cain's testimony incredible, any testimony regarding how Cain performs daily activities (*i.e.* with frequent breaks) must be addressed in the RFC assessment.

### E. The ALJ's Step Four Analysis Was Deficient

Cain also argues that the ALJ improperly concluded that she could perform her past relevant work as a bartender. To determine whether a claimant is "capable of returning to her former work, the ALJ must ascertain the demands of that work in relation to the claimant's present physical capacities." *Strittmatter v. Schweiker*, 729 F.2d 507, 509 (7th Cir. 1984). This requires the ALJ "to make specific findings of fact as to the claimant's RFC, the physical and mental demands of the claimant's past job, and, whether given the claimant's RFC, she could return to her past work." *Strocchia v. Astrue*, No. 08 C 2017, 2009 WL 2992549, at *18 (N.D. Ill. Sept. 16, 2009) (*citing Prince v. Sullivan*, 933 F.2d 598, 603 (7th Cir. 1991)); *see also* SSR 82-62, 1982 WL 31386 (1982). The ALJ's assessment must be explicit to allow for meaningful review. *Id*; SSR 82-62, 1982 WL 31386, at *3 ("Past work experience must be considered carefully").

The Commissioner does not dispute that the ALJ failed to discuss the specific demands of the bartender position, as Cain performed it or generally. In fact, ALJ Marceille stated only that: "[Cain] managed bar in the mornings and tended bar in the afternoons. She lifted cases of liquor. She supervised six individuals." (R. 17.) Then, relying on the testimony of the VE, the ALJ described the position as light and semi-

skilled, and concluded that Cain is able to perform her past relevant work as it is actually and generally performed. (R. 19.)

We agree that the ALJ's step four analysis was deficient. As the Seventh Circuit has explained,

> an ALJ cannot describe a claimant's job in a generic way… and conclude on the basis of the claimant's RFC that she can return to her previous work. Instead, the ALJ must list the specific physical requirements of the previous job and assess, in light of the available evidence, the claimant's ability to perform these tasks.

*Nolen v. Sullivan*, 939 F. 2d 516, 518 (7th Cir. 1991). Here, both the ALJ and the VE described Cain's past work in a generic way and thus, remand is required. *See, e.g., Kenefick v. Astrue*, 535 F. Supp. 2d 898, 908-909 (N.D. Ill. 2008) (remanding where, among other things, the ALJ failed to analyze the specific requirements of claimant's past relevant work). While we recognize that Cain testified at the hearing regarding the requirements of her position, the ALJ's failure to address that testimony in his opinion leaves us unable to assess whether the ALJ did in fact comply with the requirements of SSR 82-62. *See Strocchia,* 2009 WL 2992549, at *18.[1]

Additionally, ALJ Marceille provided no more than a perfunctory statement to support his comparison of Cain's RFC with the physical demands of her past relevant work. This is inadequate given claimant's specific testimony that although she is able to sit and stand, she is no longer able to walk the distance of the bar. On remand the ALJ must conduct a careful appraisal of claimant's statements as to which past work requirements can no longer be met and the reason for her inability to meet those

---

[1] We reject the Commissioner's argument that Cain simply failed to meet her burden of proof at this step. As the Court stated in *Moore v. Astrue*, No. 08 C 5180, 2010 WL 2166629, at *10 (N.D. Ill. May 27, 2010), "the Commissioner conflates the claimant's evidentiary burdens with the ALJ's duty to explain her decision."

16

requirements.  *See* SSR 82-62, 1982 WL 31386, at *3.

Based on our rulings above, and with the understanding that further proceedings will be required on remand, we do not address Cain's remaining arguments.  However, we remind the ALJ that when assessing Cain's RFC, he must consider Cain's obesity in combination with her other impairments.  *See* SSR 02-1p.  Additionally, any questions posed to the VE must incorporate all impairments and limitations that the ALJ accepts as credible.  *See Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009).

### III.  Conclusion

For the reasons set forth above, Cain's motion for summary judgment [19] is granted. The case is remanded to the Social Security Administration for further proceedings consistent with this Opinion.  It is so ordered.

                                          ENTERED:

                                          **MICHAEL T. MASON**
                                          **United States Magistrate Judge**

**Dated: December 21, 2011**